No. 25-70012

# In the United States Court of Appeals for the Fifth Circuit

TODD KELVIN WESSINGER,
*Petitioner-Appellee*

v.

DARREL VANNOY, WARDEN, LOUISIANA STATE PENITENTIARY,
*Respondent-Appellant*

———————————

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 3:04-cv-637, Hon. John W. deGravelles

———————————

## OPENING BRIEF OF APPELLANT

———————————

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 999-1864
BrungardM@ag.louisiana.gov

MORGAN BRUNGARD
Deputy Solicitor General

ELIZABETH L. BROWN
Assistant Solicitor General
*Counsel for Respondent-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellant—as a "governmental" party—need not furnish a certificate of interested persons.

*/s/ Morgan Brungard*
MORGAN BRUNGARD

## STATEMENT REGARDING ORAL ARGUMENT

This is the second time the Court has seen Louisiana inmate Todd Wessinger's habeas case. The first time, the Court reversed (without remanding) the grant of habeas relief and reinstated Wessinger's two capital sentences. *Wessinger v. Vannoy* (*Wessinger I*), 864 F.3d 387, 393 (5th Cir. 2017). That should have been the end of this case. The district court, however, has again granted habeas relief, vacated Wessinger's sentences, and remanded his case to state court for resentencing. ROA.16637-38. In so doing, the district court made numerous procedural and substantive errors that require reversal through a straightforward application of law. Given that this is a capital case, however, Appellant respectfully requests oral argument to aid the Court's resolution of these issues.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS ...........................................i

STATEMENT REGARDING ORAL ARGUMENT ...............................ii

TABLE OF CONTENTS ............................................................... iii

TABLE OF AUTHORITIES.................................................................vi

INTRODUCTION......................................................................... 1

JURISDICTIONAL STATEMENT ............................................... 6

ISSUES PRESENTED .................................................................... 7

STATEMENT OF THE CASE ........................................................8

    I. THE JURY SENTENCES WESSINGER TO DEATH FOR CALLOUSLY
    MURDERING STEPHANIE GUZZARDO AND DAVID BREAKWELL FOR
    $7,000. .........................................................................................8

    II. IN STATE POSTCONVICTION PROCEEDINGS, WESSINGER
    UNSUCCESSFULLY CHALLENGES HIS TRIAL COUNSEL'S PENALTY-
    PHASE ASSISTANCE. ................................................................10

    III. FOR TWO DECADES, WESSINGER'S FEDERAL HABEAS
    GAMESMANSHIP THWARTS FINALITY. .............................12

        A. The District Court Initially Rejects Wessinger's Ineffective
        Assistance Claim. ................................................................12

        B. Wessinger Argues His New Evidence Fundamentally
        Alters His Claim and Blames Gisleson's Ineffectiveness to
        Excuse Procedural Default.....................................................13

        C. Wessinger's *Martinez* Theory Fails...........................15

D.  Wessinger Again Changes Position, Now Claiming Gisleson Was Diligent but Held Back by an Ineffective State Process...16

SUMMARY OF THE ARGUMENT ........................................................19

STANDARD OF REVIEW...................................................................23

ARGUMENT .....................................................................................23

I.  WESSINGER'S POST-APPEAL MOTION FOR SUMMARY JUDGMENT WAS AN IMPROPER RULE 60(B) MOTION BROUGHT SEVEN YEARS AFTER HE ABANDONED HIS INEFFECTIVE-STATE-PROCESS THEORY. ...................................................................................24

II. WESSINGER'S NEW EVIDENCE CANNOT FUNDAMENTALLY ALTER A CLAIM ADJUDICATED BY THE STATE COURTS TO EVADE AEDPA DEFERENCE. ...........................................................................35

III. IF WESSINGER'S CLAIM WERE FUNDAMENTALLY ALTERED, IT WOULD BE TIME-BARRED. ..................................................................42

IV. DENYING FUNDING TO WESSINGER'S POSTCONVICTION COUNSEL IN ACCORDANCE WITH STATE LAW DOES NOT EXCUSE HIS PROCEDURAL DEFAULT. .........................................................................45

A.  Wessinger Cannot Blame a Lack of Resources for Gisleson's Failure to Obtain Evidence He Claims Was "Readily Available" to His Trial Counsel................................................46

B.  The State Court's Denial of Funding Is a Matter of State Law Entitled to Absolute Deference. .......................................49

C.  A Different Louisiana Prisoner's Funding Litigation Has No Bearing Here................................................................51

D.  Denying Funding Did Not Make the State Process Ineffective to Protect Wessinger's Rights..................................55

V.  IN ALL EVENTS, WESSINGER'S TRIAL COUNSEL PROVIDED
EFFECTIVE MITIGATION ASSISTANCE. ...............................................59

    A.  The State Court's Adjudication of the Claim Was Not
Unreasonable. ...............................................................................60

    B.  Wessinger's Claim Fails under De Novo Review with New
Evidence. .......................................................................................66

CONCLUSION .................................................................................................70

CERTIFICATE OF SERVICE...............................................................................71

CERTIFICATE OF COMPLIANCE........................................................................72

# TABLE OF AUTHORITIES

## Cases

*Ake v. Oklahoma,*
470 U.S. 68 (1985)........................................................................56, 57

*Anderson v. Johnson,*
338 F.3d 382 (5th Cir. 2003).................................................40, 44, 45

*Arthur A. Collins, Inc. v. AT&T Co.,*
103 F.3d 125, 1996 WL 731410 (5th Cir. 1996) .................................28

*Bagwell v. Dretke,*
372 F.3d 748 (5th Cir. 2004)........................................................40, 45

*Banister v. Davis,*
590 U.S. 504 (2020)............................................................................31

*BLOM Bank SAL v. Honickman,*
605 U.S. 204 (2025)..................................................................... passim

*Broadnax v. Lumpkin,*
987 F.3d 400 (5th Cir. 2021)........................................................40, 42

*Brown v. Thaler,*
684 F.3d 482 (5th Cir. 2012)........................................................65, 67

*Burton v. Stewart,*
549 U.S. 147 (2007)............................................................................32

*Calderon v. Thompson,*
523 U.S. 538 (1998)............................................................................27

*Charles v. Thaler,*
629 F.3d 494 (5th Cir. 2011).................................................21, 50, 51

*Coleman v. Thompson,*
501 U.S. 722 (1991)............................................................................56

*Cullen v. Pinholster,*
563 U.S. 170 (2011).............................................................37, 39, 60

*Day v. Quarterman,*
566 F.3d 527 (5th Cir. 2009).............................................................66

*Gonzalez v. Crosby,*
545 U.S. 524 (2005) ........................................................................ 25

*Harrington v. Richter,*
562 U.S. 86 (2011) ......................................................... 61, 62, 66, 67

*Hernandez v. Results Staffing, Inc.,*
907 F.3d 354 (5th Cir. 2018) .......................................................... 27

*In re Coastal Plains, Inc.,*
179 F.3d 197 (5th Cir. 1999) .......................................................... 33

*In re Coleman,*
768 F.3d 367 (5th Cir. 2014) .......................................................... 48

*In re Westcott,*
135 F.4th 243 (5th Cir. 2025) ......................................................... 35

*Johnson v. Cockrell,*
306 F.3d 249 (5th Cir. 2002) ..................................................... 65, 67

*Johnson v. Miller,*
126 F.4th 1020 (5th Cir. 2025) ......................................... 21, 43, 44, 45

*Kemp v. Dretke,*
86 F. App'x 680 (5th Cir. 2004) ................................................. 50, 55

*Kemp v. United States,*
596 U.S. 528 (2022) ........................................................................ 34

*Martinez v. Ryan,*
566 U.S. 1 (2012) ................................................................ 13, 30, 37

*Matchett v. Dretke,*
380 F.3d 844 (5th Cir. 2004) .......................................................... 30

*Mayle v. Felix,*
545 U.S. 644 (2005) ................................................................. 43, 44

*McCleskey v. Zant,*
499 U.S. 467 (1991) .......................................................................... 2

*Mendoza v. Lumpkin,*
81 F.4th 461 (5th Cir. 2023) .......................................................... 40

*Moore v. Johnson,*
225 F.3d 495 (5th Cir. 2000) ........................................... 22, 55, 56, 57

*Morris v. Dretke*,
413 F.3d 484 (5th Cir. 2005) ................................................................23

*Nelson v. Lumpkin*,
72 F.4th 649 (5th Cir. 2023) ..................................................... passim

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*,
507 U.S. 380 (1993) ..............................................................................34

*Prible v. Lumpkin*,
43 F.4th 501 (5th Cir. 2022) ...............................................................44

*Raby v. Davis*,
907 F.3d 880 (5th Cir. 2018) ...............................................................23

*Schaetzle v. Cockrell*,
343 F.3d 440 (5th Cir. 2003) ...............................................................50

*Schiller v. Physicians Res. Grp., Inc.*,
342 F.3d 563 (5th Cir. 2003) ...............................................................30

*Shinn v. Ramirez*,
596 U.S. 366 (2022) .......................................................................48, 57

*State ex rel. Wessinger v. Cain*,
2003-3097 (La. 9/3/04), 882 So. 2d 605 ........................................36, 61

*State ex rel. Wessinger v. State*,
2001-1366 (La. 5/23/01), 792 So. 2d 742 ...........................................11

*State ex rel. Williams v. State*,
2004-0575 (La. 1/12/07), 946 So. 2d 172 ...........................................53

*State ex rel. Williams v. State*,
2004-0575 (La. 12/1/04), 888 So. 2d 792 ............................................53

*State v. Touchet*,
93-2839 (La. 9/6/94), 642 So. 2d 1213 ..........................................11, 50

*State v. Wessinger*,
98-1234 (La. 5/28/99), 736 So. 2d 162 ...............................8, 9, 68, 69

*Stevens v. Epps*,
618 F.3d 489 (5th Cir. 2010) ...........................................................49, 56

*Strickland v. Washington*,
466 U.S. 668 (1984) .........................................................23, 60, 61, 65

*Tollett v. City of Kemah,*
  285 F.3d 357 (5th Cir. 2002) ............................................................. 27

*United States v. Alaniz,*
  5 F.4th 632 (5th Cir. 2021) ......................................................... 21, 43

*United States v. Gonzalez,*
  592 F.3d 675 (5th Cir. 2009) ............................................................. 43

*Wessinger v. Louisiana,*
  528 U.S. 1050 (1999) ......................................................................... 9

*Wessinger v. Louisiana,*
  528 U.S. 1145 (2000) ......................................................................... 9

*Wessinger v. Vannoy,*
  864 F.3d 387 (5th Cir. 2017) ..................................................... passim

*Wogenstahl v. Mitchell,*
  668 F.3d 307 (6th Cir. 2012) ............................................................. 58

*Wong v. Belmontes,*
  558 U.S. 15 (2009) ............................................................................. 69

*Yohey v. Collins,*
  985 F.2d 222 (5th Cir. 1993) ............................................................. 58

## Statutes

28 U.S.C. § 1291 .................................................................................. 6

28 U.S.C. § 2244 ......................................................................... 31, 42

28 U.S.C. § 2254 ...................................................................... passim

28 U.S.C. § 2553 .................................................................................. 6

Tex. Crim. Pro. Art. 37.071(b)(1) .......................................................... 68

## Rules

Federal Rule of Civil Procedure 15(c) ......................................... 7, 43, 45

Federal Rule of Civil Procedure 60(b)(6) ......................................... passim

## INTRODUCTION

This is not the first time this Court has had to "reverse the district court's grant of habeas relief" to petitioner-appellee Todd Wessinger. *Wessinger I*, 864 F.3d 387, 393 (5th Cir. 2017). Previously, "the district court erred" in finding Wessinger's postconviction counsel was ineffective for not "conduct[ing] any mitigation investigation." *Id.* at 391–92.

Yet, the district court has again vacated Wessinger's capital sentences for his 1995 point-blank murders of Stephanie Guzzardo and David Breakwell while robbing a Baton Rouge restaurant where he previously worked. This was no robbery-gone-wrong: Wessinger intended to kill all witnesses—and nearly succeeded. Miraculously, two witnesses survived and were able to identify Wessinger as the perpetrator. Mike Armentor survived his two gunshot wounds. And while Wessinger tried to shoot Alvin Ricks execution-style, his gun failed to fire when he held it to Ricks's head. Recognizing the heinous nature of Wessinger's crime, a Louisiana jury sentenced Wessinger to death on both counts of first degree murder.

Wessinger's guilt is beyond doubt, as was this Court's 2017 no-remand reversal. *See id.* at 393. But here we are again. Following this

1

Court's reversal, the district court allowed Wessinger to re-argue the same ineffective assistance claim for which this Court already denied relief, and the district court ultimately re-vacated his death sentences. Wessinger's theory justifying this re-do is that his trial counsel was ineffective because he did not uncover supposed abuse and brain damage that Wessinger himself denied when talking with a defense expert before trial.

This Court should reverse and render judgment in favor of Appellant Darrell Vannoy, the Warden of Louisiana State Penitentiary (State), to put a conclusive end to this case. For twenty years, Wessinger has evaded AEDPA's relitigation bar, restrictions on new evidence, and statute of limitations. His maneuvers (sanctioned by the district court) have stymied the State's vital interest in finality by continuously changing his position each time a prior theory is rejected. This "[p]erpetual disrespect for the finality of convictions disparages the entire criminal justice system," *McCleskey v. Zant*, 499 U.S. 467, 492 (1991), and this Court should sanction it no further. This appeal provides many avenues to put these proceedings to bed—the Court need only pick one.

The most direct path to reversal is what this Court concluded in the prior appeal—that the State courts adjudicated Wessinger's ineffective assistance claim on the merits. *Wessinger I*, 864 F.3d at 390. That holding makes this case simple.

He cannot use a post-appeal, Federal Rule of Civil Procedure 60(b)(6) motion seventeen months *after Wessinger I* foreclosed relief on his ineffective assistance claim to re-argue that the State court process was ineffective because it denied him postconviction funding. Nor can he use Rule 60(b)(6) to revive the funding issue after abandoning it in *Wessinger I*.

*Wessinger I* also forecloses his misguided theory that adding new evidence in federal habeas somehow alters his ineffective claim and renders it unadjudicated by the State courts. Wessinger had to show that the State courts' rejection of his claim was unreasonable based solely on the State court record, and he failed to do so.

Even if this Court accepts Wessinger's "fundamentally altered" theory, however, the result is the same. Wessinger's current claim is untimely because it was first raised after AEDPA's one-year bar and does not relate back to any claim brought in his original federal petition.

Beyond that, his claim is procedurally defaulted, and he lacks cause and prejudice to excuse his default. The State postconviction court denied funding because Wessinger failed to make the requisite showing under Louisiana law. The State court's interpretation of Louisiana law is binding on federal habeas courts.

Wessinger could not make that showing because his postconviction counsel did not need additional resources to gather the evidence he seeks to introduce on federal habeas review, so a denial of resources cannot be his excuse for not introducing it in State court. Ironically, the district court here agreed: "Neither time nor inadequate resources would have prevented [Wessinger's] counsel" from acquiring that evidence. ROA.16633-34. While the district court held only Wessinger's *trial* counsel to that standard, *see id.*, the same is just as true for his *postconviction* counsel. The evidence was readily available regardless of resources, so lack of funding does not excuse Wessinger's failure to introduce that evidence in State court. His current ineffective claim is thus procedurally defaulted.

Finally, if the Court reaches the merits of Wessinger's ineffective claim, reversal is still in order. His counsel cannot be ineffective for

failing to investigate evidence of abuse or brain injury that (a) Wessinger himself said did not exist and (b) further supports the jury's conclusion that Wessinger is a perpetually violent threat.

In sum, Wessinger's ineffective assistance claim (a) was either decided by *Wessinger I* or abandoned, (b) was untimely raised both before and after *Wessinger I,* (c) was either adjudicated in State court or procedurally defaulted, and, in all events, (d) fails on the merits. For any of these reasons, the Court should reverse the grant of habeas relief, reinstate Wessinger's death sentences, and render judgment for the State.

## JURISDICTIONAL STATEMENT

On December 20, 2022, the district court issued its judgment vacating Wessinger's death sentences. ROA.16639. On January 17, 2023, the State timely sought to alter the judgment under Federal Rule of Civil Procedure 59(e). ROA.16645. The district court stayed resolution of that motion pending this Court's and the Supreme Court's resolution of a different habeas case. ROA.16734-35. Following the Supreme Court's denial of certiorari in that case, the district court, on June 20, 2025, lifted the stay and denied the State's Rule 59(e) motion. ROA.16738-39. The State appealed that same day. ROA.16742. This Court thus has jurisdiction under 28 U.S.C. §§ 2553 and 1291.

## ISSUES PRESENTED

1. Whether the district court erred by permitting Wessinger to revive his habeas petition in a Rule 60(b)(6) motion based on an abandoned cause-and-prejudice theory seventeen months after the prior appeal concluded.

2. Whether the district court erred by concluding that new evidence presented for the first time in a federal habeas proceeding "fundamentally altered" a claim adjudicated by the State postconviction court.

3. Whether the district court erred by allowing that "fundamentally altered" claim to relate back under Federal Rule of Civil Procedure 15(c) to the claim he raised in his habeas petition that is identical to the one the State court adjudicated.

4. Whether the district court erred by concluding the State court's denial of postconviction funding in accordance with State law constituted cause and prejudice excusing Wessinger's default.

5. Whether the district court erred by concluding trial counsel was ineffective by not investigating abuse and brain damage that his client contemporaneously denied existed.

7

## STATEMENT OF THE CASE

### I. THE JURY SENTENCES WESSINGER TO DEATH FOR CALLOUSLY MURDERING STEPHANIE GUZZARDO AND DAVID BREAKWELL FOR $7,000.

In 1995, Todd Wessinger went to rob his former employer, Calendar's Restaurant in Baton Rouge, and make sure no witnesses survived. *State v. Wessinger*, 98-1234 (La. 5/28/99), 736 So. 2d 162, 169. Mike Armentor, a Calendar's employee, saw Wessinger and greeted him. *Id.* Wessinger returned that greeting by shooting Armentor twice in the back. *Id.* Armentor suffered severe abdominal injuries but eventually survived. *Id.* Next, Wessinger tried to kill Alvin Ricks, another employee, placing his gun against Ricks's head, but the gun misfired. *Id.*; ROA.6375-77 (Ricks Testimony).

Stephanie Guzzardo, the manager on duty, "heard the commotion [from the office] and called 911." *Wessinger*, 736 So. 2d at 169. "Before she could speak to the operator," Wessinger entered the office. *Id.* The 911 call recorded what followed. *See* ROA.6386, 6515-16, 6735-36. Guzzardo pleaded for her life, telling Wessinger she would not report him to the police. ROA.6735-36. Wessinger "t[old] her to 'shut up'" and "shot her through the heart." *Wessinger*, 736 So. 2d at 169. The recording

8

captured an additional eighteen seconds of Guzzardo dying in agony. ROA.6515-16.

Wessinger took about $7,000 from the office. *Wessinger*, 736 So. 2d at 169. He spotted David Breakwell, another employee, and shot Breakwell as he begged for his life. *Id.* Wessinger "then left the restaurant on his bicycle." *Id.* "Breakwell died en route to the hospital." *Id.* Later that day, Wessinger showed the stolen money to a longtime friend and told him, "if the gun wouldn't have jammed, he would have killed all them." ROA.6437-38.

A Louisiana jury convicted Wessinger of two counts of first degree murder for killing Guzzardo and Breakwell and sentenced him to death. *Wessinger*, 736 So. 2d at 169. The jury concluded Wessinger's crime "was committed in an especially heinous, atrocious, or cruel manner," along with two other aggravating circumstances. *Id.* at 169–70. The Louisiana Supreme Court upheld his convictions and sentences on direct review. *Id.* at 197. The United States Supreme Court denied his petitions for certiorari and rehearing, rendering his convictions and sentences final for purposes of collateral review. *Wessinger v. Louisiana*, 528 U.S. 1050 (1999); *Wessinger v. Louisiana*, 528 U.S. 1145 (2000).

## II.   IN STATE POSTCONVICTION PROCEEDINGS, WESSINGER UNSUCCESSFULLY CHALLENGES HIS TRIAL COUNSEL'S PENALTY-PHASE ASSISTANCE.

In 2000, Wessinger initiated the State's collateral review process by filing a shell petition for postconviction relief in State court. ROA.6906. Wessinger's initial postconviction counsel withdrew, and an attorney named Soren Gisleson was appointed to represent Wessinger pro bono. *Wessinger I*, 864 F.3d at 389. Gisleson unsuccessfully sought funding for investigative assistance from various State and local indigent assistance entities and the postconviction court. *Id.*; ROA.3976, 12524, 12526. The Louisiana Indigent Defense Assistance Board (LIDAB) told Gisleson that all of its funding was allocated to the Capital Post Conviction Project of Louisiana (CPCPL), and CPCPL told Gisleson it would not fund experts or contract investigators for pro bono attorneys like Gisleson, though it left open the possibility of assistance for "investigative aid." ROA.3976, 12524, 12526.

The postconviction court later held a hearing to determine whether Gisleson had made a sufficient showing under State law for court-ordered funding. ROA.7051-63. The court denied the funding request given Gisleson's failure to comply with the standard set forth in *State v.*

10

*Touchet*, 93-2839 (La. 9/6/94), 642 So. 2d 1213, 1216, which requires a defendant to show "a reasonable probability both that an expert would be of assistance to the defense and the denial of expert assistance would result in a fundamentally unfair trial." ROA.7055, 7062-63. Gisleson asked the Louisiana Supreme Court to review the denial of funding, but his writ application was denied. ROA.14586-619; *State ex rel. Wessinger v. State*, 2001-1366 (La. 5/23/01), 792 So. 2d 742. Gisleson then filed a first amended petition in June 2001, ROA.15095-231, which was referred to a judicial commissioner who recommended dismissing the petition. ROA.6906-07.

Gisleson later obtained $5,000 from his firm to hire assistance to help amend his postconviction petition again. *Wessinger I*, 864 F.3d at 390. This second amended petition "added some discrete allegations concerning mitigation and ineffective assistance of counsel in the penalty phase." *Id.* (brackets omitted). Among other things, "the second amended petition alleged that Wessinger's trial counsel did not 'conduct professional/effective investigation in mitigation' because he failed to 'adequately explore Wessinger's medical history.'" *Id.* (brackets omitted); *see* ROA.12781, 12817-32 (second amended postconviction petition). The

11

postconviction court rejected this claim "on the merits," *Wessinger I*, 864 F.3d at 390; ROA.13801-02, and the Louisiana Supreme Court declined review, *State ex rel. Wessinger v. Cain*, 2003-3097 (La. 9/3/04), 882 So. 2d 605.

### III.    FOR TWO DECADES, WESSINGER'S FEDERAL HABEAS GAMESMANSHIP THWARTS FINALITY.

In 2004, Wessinger filed his federal petition. The State consistently defeated his arguments for relief. And each time, Wessinger shifted his position to keep this case going.

### A. The District Court Initially Rejects Wessinger's Ineffective Assistance Claim.

Wessinger's first federal petition was strikingly similar to his second amended State postconviction petition, at least as to his claim of ineffective assistance of penalty-phase counsel. *Compare* ROA.12781, 12817–32 (second amended postconviction petition); *with* ROA.40, 79-88 (first habeas petition). Six years later, Wessinger amended his habeas petition to support his ineffective penalty-phase assistance claim for the first time with additional mitigation evidence of abuse, brain damage, and other family history. ROA.1464, 1695-767.

In 2012, the district court denied Wessinger's petition in full. ROA.2737. Relevant to this appeal, the district court concluded that

Wessinger's claim of ineffective penalty-phase counsel was subject to AEDPA deference because the State courts had adjudicated that claim on the merits, ROA.2716-18, and that, under that standard, Wessinger failed to show the State courts' denial of that claim was unreasonable, ROA.2726-29.

### B. Wessinger Argues His New Evidence Fundamentally Alters His Claim and Blames Gisleson's Ineffectiveness to Excuse Procedural Default.

Having lost his ineffective penalty-phase counsel claim under AEDPA deference, Wessinger switched horses. A week after the district court entered judgment, the Supreme Court decided *Martinez v. Ryan*, which excused "procedural default of an ineffective-assistance claim" based on ineffective assistance of postconviction counsel. 566 U.S. 1, 5 (2012).

Wessinger then filed a Rule 59(e) motion to alter the judgment, arguing that new mitigation evidence fundamentally altered his claim so it was not the same claim the State courts had rejected on the merits and thus was not governed by AEDPA deference under 28 U.S.C. § 2254(d). ROA.2765-68. Wessinger correctly recognized that his argument meant his claim was procedurally defaulted. ROA.2771. But relying on

*Martinez*, he sought to excuse his default by arguing Gisleson was ineffective and, alternatively, that the State process was ineffective because it denied Gisleson funding. ROA.2772-80.

The district court granted in part Wessinger's request to alter the judgment. ROA.3235-41 (2012 59(e) Order). It concluded that Wessinger's new mitigation evidence—a "psychiatric evaluation, neuropsychological testing, evidence of low intellectual functioning, and evidence of isolation and abuse"—was "material and significantly different and stronger than what he presented to state court," making the claim "not exhausted" and "procedurally barred." ROA.3237-38. Based on that conclusion, the court reopened the case for two inquiries: whether (1) *Martinez* excused Wessinger's default and (2) trial counsel was ineffective under a de novo standard. ROA.3238-40. The district court did not address Wessinger's arguments of ineffective State process, except to note that the denial of funds could support ineffectiveness of counsel. ROA.3239.

The district court then granted Wessinger an evidentiary hearing, which ultimately took place over multiple days in 2015. ROA.3732. The parties filed pre- and post-hearing briefs that discussed cause and

prejudice only through the lens of *Martinez*. ROA.3244-58 (Wessinger Pre-Hearing Br.); ROA.3460-79 (State Pre-Hearing Br.); ROA.3600-28 (Wessinger Post-Hearing Br.); ROA.3630-78 (State Post-Hearing Br.).

### C. Wessinger's *Martinez* Theory Fails.

After these additional proceedings, the district court concluded that Wessinger proved both Gisleson and his trial counsel provided ineffective assistance in investigating and presenting mitigating evidence, and vacated his death sentences. ROA.3732-46. The State appealed, and this Court reversed (without remand), concluding Wessinger failed to prove Gisleson was ineffective. *Wessinger I*, 864 F.3d at 393. The Court held that Wessinger's failure to "present evidentiary support of his claim to the state post-conviction court" was "attributable … to the state post-conviction court's decisions [under State law] to deny a hearing, discovery, and funds—decisions which are entitled to deference and which Wessinger *[did] not challenge*" in *Wessinger I. Id.* (emphasis added).

This Court declined to rehear the case en banc. Order, *Wessinger I*, No. 15-70027 (5th Cir. Aug. 21, 2017), ECF 91-2. And the Supreme Court denied Wessinger's petition for certiorari in March 2018. ROA.3786. At

15

that point, the full appellate process had reviewed and rejected all of Wessinger's habeas claims, either on their merits or as procedurally defaulted.

### D. Wessinger Again Changes Position, Now Claiming Gisleson Was Diligent But Held Back by an Ineffective State Process.

For seventeen months after the Supreme Court's denial of certiorari, Wessinger took no action in this case. ROA.24. Then, in August 2019, he filed a purported "summary judgment" motion that alternatively sought relief from judgment under Rule 60(b)(6)'s catch-all provision. ROA.3787-90. His late-breaking motion claimed that his ineffective-State-process theory was unresolved and remained an open avenue to excuse procedural default. *Id.* In a 180-degree reversal of his *Wessinger I* argument that Gisleson "was deficient because he 'failed to raise the claim of ineffective assistance of trial counsel at the penalty phase,'" 864 F.3d at 392 (brackets and emphasis omitted), Wessinger's motion heralded Gisleson's diligence in pursuing his claim and claimed Gisleson was "faultless" for any deficiencies. ROA.3812-15.

16

The district court, now Judge deGravelles,[1] initially denied Wessinger's motion, concluding his ineffective-State-process theory had already been rejected and that any Rule 60(b) motion was untimely. ROA.4208-12. Par for the course in this seemingly endless saga, Wessinger sought reconsideration of that order. ROA.4213. And this time, the district court agreed Wessinger could try to overcome default by blaming the State process. ROA.4276-77.

Ultimately, the district court excused Wessinger's procedural default due to "the unlawful nature in which Wessinger was denied resources" in the postconviction process. ROA.16621. The district court relied almost entirely on State-court proceedings involving a different Louisiana inmate, Jimmy Ray Williams, in determining that Gisleson was "unlawful[ly]" denied funding. ROA.16616-21.

In Williams's case, the State court found Williams was entitled to expert funding for his postconviction petition and directed LIDAB to provide funding. ROA.16616. LIDAB refused based on its policy of denying funding to indigent inmates represented by pro bono counsel. *Id.*

---

[1] Wessinger's case was reassigned to Judge deGravelles because Judge Brady, who had presided over the case since 2004, died in 2017. *See* ROA.24.

17

The State court concluded LIDAB's policy violated Louisiana law, which led to LIDAB changing its policy and Williams receiving funding. ROA.16616-18.

The district court here believed that, because Wessinger was also represented by pro bono counsel and subject to LIDAB's no-funding policy, his postconviction process was "fundamentally unfair" and Gisleson's request for funding should have been granted as a matter of State law. ROA.16621.

The district court then applied a de novo standard to Wessinger's claim that his penalty-phase counsel was ineffective because he failed to obtain information about "Wessinger's history of childhood seizures and violence [in] the Wessinger family [that] was readily available to counsel through Troy Wessinger," Wessinger's brother. ROA.16633. The district court explained that "[n]either time nor inadequate resources would have prevented [Wessinger's penalty-phase] counsel from asking Troy Wessinger the necessary questions to elicit this critical mitigation evidence." *Id.* The district court further concluded that Wessinger was prejudiced because the jury did not hear testimony that Wessinger's mother threatened him with a gun and that he had "brain damage to the

18

area responsible for executive functioning, resulting in impaired ability to make good decisions." ROA.16636. Based on its conclusions, the district court granted Wessinger's habeas petition and vacated his two death sentences. ROA.16637-38. Following the denial of the State's Rule 59(e) motion, ROA.16738-39, the State appealed, ROA.16742.

## SUMMARY OF THE ARGUMENT

This Court should reverse the grant of habeas relief and vacatur of Wessinger's sentences and render judgment for the State for several reasons.

*First*, Wessinger's post-appeal motion for summary judgment or alternatively for relief from judgment under Rule 60(b)(6) was procedurally improper for multiple reasons and should have been denied for those reasons alone. Following *Wessinger I*'s remand-free reversal, his motion (a) was untimely, (b) had been abandoned on appeal, (c) contravened the law of the case doctrine and the mandate rule, (d) is barred by judicial estoppel, and (e) did not (and cannot) satisfy Rule 60(b)(6)'s "extraordinary circumstances" requirement to "reopen his case." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 210 (2025). Wessinger cannot raise a new cause-and-prejudice theory seventeen

19

months after *Wessinger I* and after seven years of litigation where Wessinger, the State, and the district court all believed the sole cause-and-prejudice issue was Gisleson's ineffectiveness. It is far too late to change tactics now.

*Second*, Wessinger's only remaining claim—that his penalty-phase counsel rendered ineffective assistance by failing to introduce additional mitigation evidence—was adjudicated on the merits in State court, and he cannot overcome AEDPA's relitigation hurdles. The district court believed the new evidence Wessinger presented for the first time in federal court fundamentally altered his claim. Not so. Wessinger's additional "instances of trial counsel's alleged deficient performance at sentencing" do not "fundamentally alter the ineffective assistance claim adjudicated in the state court." *Nelson v. Lumpkin*, 72 F.4th 649, 659 (5th Cir. 2023). The State courts rejected his claim on the merits, and thus AEDPA deference is required.

*Third*, even if the State courts had not adjudicated Wessinger's claim, reversal would still be in order for at least three independent reasons.

**A.** If Wessinger's new evidence made his claim new, then it also made his claim time-barred because it cannot relate back to his timely filed federal claim that was essentially identical to the claim presented in State court. To relate back, a claim cannot "require factual support that 'differ[s] in both time and type' from that required by the timely claim," *United States v. Alaniz*, 5 F.4th 632, 636 (5th Cir. 2021) (citation omitted), and the original claim must have put the State on notice of his current claim, *Johnson v. Miller*, 126 F.4th 1020, 1027 (5th Cir. 2025). If Wessinger's claim is fundamentally altered, it cannot satisfy either of these requirements.

**B.** He also cannot overcome procedural default. The State's denial of funding cannot excuse Gisleson's failure to find evidence available through conversations with Wessinger and his family members. Moreover, the State court denied funding because Gisleson did not make the required showing of need under State law. That decision cannot be challenged in federal habeas, *Charles v. Thaler*, 629 F.3d 494, 500–01 (5th Cir. 2011), so any notion that State law entitled Wessinger to funding is meritless. Furthermore, the State process effectively protected Wessinger's rights by providing him all tools needed for him to bring his

21

claim—no funding was necessary. *Moore v. Johnson*, 225 F.3d 495, 502–03 (5th Cir. 2000).

**C.** Finally, Wessinger's underlying ineffective assistance claim lacks merit. His trial counsel had no obligation to undertake a seemingly frivolous investigation into claims of abuse or brain damage when his client denied such evidence existed, and Wessinger fails to show a reasonable probability that the jury would not have imposed the death penalty had it heard this evidence.

Under any of these paths, the destination is the same. The Court should reverse the grant of habeas relief and vacatur of Wessinger's sentences and render judgment for the State.

## STANDARD OF REVIEW

In a habeas appeal, the Court "review[s] the district court's findings of fact for clear error and its conclusions of law de novo." *Wessinger I*, 864 F.3d at 391 (citation omitted). Whether a claim was exhausted or procedurally defaulted is a question of law. *See Morris v. Dretke*, 413 F.3d 484, 491 (5th Cir. 2005). "Whether counsel was ineffective 'is a mixed question of law and fact.'" *Wessinger I*, 864 F.3d at 391 (quoting *Strickland v. Washington*, 466 U.S. 668, 698 (1984)). The Court reviews "a Rule 60(b)(6) ruling for abuse of discretion." *Raby v. Davis*, 907 F.3d 880, 883 (5th Cir. 2018).

## ARGUMENT[2]

The Court should reverse the judgment, reinstate Wessinger's death sentences, and render judgment for the State. In granting relief, the district court made a litany of errors, starting with entertaining Wessinger's procedurally improper, post-appeal motion. Next, the district court failed to give AEDPA deference to a claim Wessinger

---

[2] Wessinger's changing formulation of his sole remaining claim is crucial to this appeal. For the Court's convenience, his claim as adjudicated by the State courts is found in his second amended State postconviction petition at ROA.12817-32. His claim in his original habeas petition is at ROA.79-88. And his claim in his amended habeas petition is at ROA.1695-767.

23

"raised … during the state post-conviction proceedings" and that the "state post-conviction court ultimately [denied] on the merits." *Wessinger I*, 864 F.3d at 392.

Even if the claim were unadjudicated, however, Wessinger's claim would be untimely because it cannot relate back to his timely petition. Beyond that, his cause-and-prejudice argument is meritless because the State process did not impede his ability to bring his claim. Finally, Wessinger's underlying ineffective assistance claim fails on the merits because he challenges his attorney's strategic decisions and cannot show prejudice.

## I.   WESSINGER'S POST-APPEAL MOTION FOR SUMMARY JUDGMENT WAS AN IMPROPER RULE 60(B) MOTION BROUGHT SEVEN YEARS AFTER HE ABANDONED HIS INEFFECTIVE-STATE-PROCESS THEORY.

After the Supreme Court denied certiorari following *Wessinger I*, this case was (and should have stayed) over. All of Wessinger's claims were conclusively adjudicated either on their merits or as procedurally defaulted. Nevertheless, seventeen months after *Wessinger I*, Wessinger filed a motion seeking summary judgment or relief from judgment under Rule 60(b), claiming his ineffective assistance of penalty-phase counsel claim could avoid procedural default under a long-abandoned theory of

24

ineffective State process. ROA.3787-91. The district court was right when it originally held that any post-appeal Rule 60(b) motion was untimely. ROA.4212. It should not have later reversed course to conclude that his State-process theory somehow survived *Wessinger I.*

Wessinger's attempt to revive his State-process theory in a Rule 60(b) motion following *Wessinger I*'s remand-free reversal was procedurally improper. And granting that motion was an abuse of discretion because it (a) contravened the law of the case doctrine and the mandate rule, (b) revived a long-abandoned theory, (c) is barred by judicial estoppel, (d) was untimely, and (e) did not (and cannot) satisfy Rule 60(b)(6)'s "extraordinary circumstances" requirement to "reopen his case." *BLOM Bank SAL*, 605 U.S. at 210. "Such circumstances will rarely occur in the habeas context." *Gonzalez v. Crosby*, 545 U.S. 524, 535 (2005).

**A.** Wessinger's attempt to revive the State-process issue in a post-appeal Rule 60(b)(6) motion violates the law of the case as established by *Wessinger I* and the mandate rule. On appeal, there is no exception to the rule of orderliness that allows Wessinger to get around *Wessinger I.*

*Wessinger I* considered the State-process issue and concluded that "Gisleson did not hire a mitigation specialist or consult experts because the state post-conviction court did not grant his motion for funds, not because of any deficiency on Gisleson's part." 864 F.3d at 392; *see id.* at 392–93 (discussing "fund" or "funding" throughout). The Court then held that Wessinger's failure to "present evidentiary support of his claim to the state post-conviction court [was] attributable … to the state post-conviction court's decisions [under State law] to deny a hearing, discovery, and funds" and that those "decisions [were] entitled to deference" by the federal courts. *Id.* at 393. That decision—that the federal habeas courts must "defer[]" to the State courts on issues of State law like court-ordered "funds" for postconviction mitigation experts, *id.*—is binding on Wessinger and the district court, and cannot be challenged except by appealing. Wessinger did that as far as he could (seeking rehearing en banc and cert) and lost. He cannot go back to district court to challenge *Wessinger I*'s "deference" conclusion. *Id.*; *see BLOM Bank SAL*, 605 U.S. at 209 (affirming district court's denial of Rule 60(b)(6) relief where "plaintiffs 'had ample opportunity to pursue all legal avenues available to them for relief,'" including an "unsuccessful[] appeal[]").

Furthermore, this Court reversed "the district court's grant of habeas relief" with no remand or further proceedings to take place.[3] ROA.3770; *Wessinger I*, 864 F.3d at 393. The district court could not permit further proceedings on Wessinger's rejected claim to reach the opposite result. *Tollett v. City of Kemah*, 285 F.3d 357, 364 (5th Cir. 2002) (noting "the district court 'is without power to do anything which is contrary to either the letter or spirit of the mandate'" (citation omitted)).

Based on the mandate, Wessinger had two options. He could have asked this Court to recall and modify the mandate to allow a remand to consider his alternative cause-and-prejudice theory. *See Calderon v. Thompson*, 523 U.S. 538, 556–59 (1998) (discussing when a court of appeals can recall its mandate and disturb "the assurance of finality" that the State receives "when a federal court of appeals issues a mandate denying habeas relief"). Alternatively, he could have brought a Rule 60(b) motion based on events that arose *after* this Court's mandate issued. *See Hernandez v. Results Staffing, Inc.*, 907 F.3d 354, 361 (5th Cir. 2018). He

---

[3] Wessinger himself recognized this effect of this Court's judgment, so his petition for rehearing (which this Court denied) requested the remand itself denied by the panel's judgment. *See* Pet. for Rehearing En Banc at 17–18, *Wessinger I*, (5th Cir. Aug. 3, 2017), ECF 87-1 (requesting "remand to the district court for further proceedings" regarding his ineffective-State-process theory).

27

did neither. Wessinger's Rule 60(b) motion relied on events *predating Wessinger I* and therefore was not a proper basis for a *post*-mandate Rule 60(b) motion. *See Arthur A. Collins, Inc. v. AT&T Co.*, <u>103 F.3d 125</u>, <u>1996 WL 731410</u>, at *4, *6 (5th Cir. 1996). Reversal is in order for these reasons alone.

**B.** What's more, the reason *Wessinger I* did not further analyze the State-process issue is because Wessinger affirmatively abandoned it: "Wessinger does not challenge [the State post-conviction court's decisions to deny a hearing, discovery, and funds] before this court." *Id.* And when asked at oral argument if he had alleged that the State court had violated his rights by not funding Gisleson, Wessinger's counsel responded, "No, we didn't. That's not an issue." Oral Argument at 48:14–48:23, *Wessinger I*, <u>864 F.3d 387</u> (No. 15-70027), https://www.ca5.uscourts.gov/ OralArgRecordings/15/15-70027_6-21-2017.mp3. The district court erred by allowing Wessinger to revive in a post-appeal Rule 60(b)(6) motion an issue considered, but not fully analyzed, by *Wessinger I* because he had abandoned it.

Indeed, the prior appeal wasn't the first time he had flipped positions on the issue. *Wessinger I* acknowledged as much. *See* <u>864 F.3d</u>

at 392 ("Wessinger previously acknowledged to the district court that he did not develop evidentiary support for his claim during state post-conviction proceedings because of decisions *by the state post-conviction court*, not because Gisleson was deficient."). The district court procedural history confirms this again and again.

In reviving Wessinger's State-process theory, the district court overlooked the scope of the proceedings as reopened by Judge Brady's 2012 order on Wessinger's Rule 59(e) motion. While Wessinger's Rule 59(e) motion raised two theories to overcome cause and prejudice, ROA.2771-80, Judge Brady permitted him to proceed only on the *Martinez* theory, *see* ROA.3238-40. His order made no mention of the effectiveness of the State postconviction process, except as to whether *counsel* could be "ineffective[] through denial of funds." ROA.3239.

This narrow reopening as to only the *Martinez* issue makes sense since granting Wessinger's Rule 59(e) motion as to his ineffective-State-process theory would have been an obvious abuse of discretion.[4] A Rule 59(e) motion "cannot be used to raise arguments which could, and should,

---

[4] The district court misconstrued this argument, believing the State was belatedly seeking reconsideration of the 2012 Rule 59(e) order. ROA.16609 n.7. The State points to Rule 59(e)'s limitations to support its reading of the 2012 59(e) order, not to challenge the order itself.

have been made before the judgment issues" but can be "appropriate when there has been an intervening change in the controlling law." *Schiller v. Physicians Res. Grp., Inc.*, 342 F.3d 563, 567 (5th Cir. 2003) (citation omitted). The Supreme Court decided *Martinez* a week after the district court entered judgment dismissing Wessinger's habeas petition. *Martinez*, 566 U.S. 1; ROA.2740. So, of course, Wessinger did not admit that his ineffective assistance claim was procedurally defaulted until *Martinez* cleared the way to argue (unsuccessfully) cause and prejudice based on Gisleson's ineffectiveness. *E.g.*, *Matchett v. Dretke*, 380 F.3d 844, 849 (5th Cir. 2004) (rejecting "ineffective assistance of state habeas counsel as 'cause' for a procedural default" (citation omitted)), *abrogated by Martinez*, 566 U.S. 1.

In contrast, Wessinger had all the law and facts needed for his ineffective-State-process theory when he filed his amended federal petition, but he failed to raise it. ROA.2773-80. As a result, that theory could not justify granting his Rule 59(e) motion. *See Schiller*, 342 F.3d at 567.

Wessinger evidently recognized the district court only reopened the case based on *Martinez* as he never blamed the State process for his

30

procedural default until this Court rejected the *Martinez* argument. Prior to the evidentiary hearing, the only issues he raised were the effectiveness of trial and postconviction counsel. ROA.3243-44. Indeed, Wessinger affirmatively abandoned his State-process theory. He told the district court that "the reasons for the failure of [Gisleson] to provide Mr. Wessinger with adequate representation *are not at issue here*," whether by the State process or by neglect. ROA.3258 (emphasis added). Likewise, his post-hearing briefing presented Gisleson's ineffectiveness as his sole cause-and-prejudice argument. ROA.3600-28.

This procedural history shows that Wessinger abandoned his State-process theory by failing to pursue it. AEDPA "prevent[s] serial challenges to a judgment of conviction" by providing a State prisoner "*one chance to bring a federal habeas challenge to his conviction.*" *Banister v. Davis*, 590 U.S. 504, 509, 515 (2020) (emphasis added). Only in rare circumstances may a prisoner file a second petition, *see* 28 U.S.C. § 2244(b), and prisoners can only use the "fixed 28-day window" of Rule 59(e) to seek "reconsideration of matters properly encompassed" in a judgment before the second-or-successive bar kicks in, *see Banister,* 590 U.S. at 516, 519 (citation omitted). AEDPA does not allow prisoners to

31

pursue one theory until it fails and then switch to a new tactic ad infinitum, as Wessinger has done throughout this case.

From May 2012, when the district court granted the Rule 59(e) motion, ROA.3240-41, to August 2019, when Wessinger filed his purported summary judgment motion, ROA.3787-91, Wessinger abandoned his State-process theory, likely because he could not credibly fault Gisleson while also arguing the State process prevented him from presenting a viable claim. While Wessinger's decision to forego his State-process argument to strengthen his *Martinez* claim is understandable, he cannot change his tune seven years later. AEDPA's aim to "reduc[e] 'piecemeal litigation'" and "streamlin[e] federal habeas proceedings" forbids such gamesmanship. *See Burton v. Stewart*, 549 U.S. 147, 154 (2007) (citations omitted). "There must be an end to litigation someday, and free, calculated, deliberate choices are not to be relieved from." *BLOM Bank SAL*, 605 U.S. at 212 (alteration and citation omitted). The Court should reverse the judgment on abandonment grounds.

**C.** Judicial estoppel also prohibits Wessinger from proceeding on his State-process theory. Each element of judicial estoppel—(1) adopting a position "clearly inconsistent" with a prior one, (2) judicial acceptance

32

of the prior position "as a preliminary matter or as part of a final disposition," and (3) intentionally adopting the positions—applies here. *In re Coastal Plains, Inc.*, 179 F.3d 197, 206–07 (5th Cir. 1999) (citation omitted). Wessinger's earlier claim that Gisleson failed to investigate his claim is incompatible with his current arguments that Gisleson was diligent but thwarted by the State process. Wessinger successfully convinced the district court in earlier proceedings to adopt his claim of Gisleson's ineffectiveness and he defended that position (to the exclusion of all others) in *Wessinger I*. Wessinger deliberately chose to blame Gisleson and then to reverse course. A straightforward application of judicial estoppel plainly bars this gamesmanship.

**D.** Even if Wessinger's State-process theory somehow were to survive the law of the case doctrine, the mandate rule, the rule of orderliness, abandonment, and judicial estoppel, it could not be revived through a putative post-appeal (with no remand) "summary judgment" motion. Rather, Wessinger's motion could be brought only under Rule 60(b) and was untimely. *See* ROA.4211-12 (collecting cases).

Following *Wessinger I*'s no-remand reversal, only Rule 60(b) allows Wessinger to "request reopening of his case." *Kemp v. United States*, 596

U.S. 528, 533 (2022) (citation omitted). As the district court initially (and properly) held, *see* ROA.4211-12 (collecting cases), Wessinger failed to bring his motion "within a reasonable time," Fed. R. Civ. P. 60(c)(1). The Court should reverse on timeliness grounds.

**E.** Wessinger has not satisfied (and cannot satisfy) Rule 60(b)(6)'s "extraordinary circumstances" requirement to "reopen his case" post-appeal. *BLOM Bank SAL*, 605 U.S. at 210. Wessinger claimed his underlying ineffectiveness claim and the lack of funding in State postconviction are "extraordinary circumstances." ROA.4087. Putting aside that both issues lack merit, *see* Sections IV and V *infra*, a proper extraordinary circumstance "suggest[s] that the party is faultless in the delay" in raising the argument. *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 393 (1993). Wessinger cannot meet this standard.

He deliberately decided to wait until 2019 to pursue his State-process theory. *See BLOM Bank SAL*, 605 U.S. at 216. Wessinger cannot blame the State postconviction court or his trial counsel for his federal counsel's decision to (1) first argue the claim was exhausted in State court, (2) then argue cause and prejudice based only on *Martinez* for

seven years (including in *Wessinger I*), and (3) finally wait an additional seventeen months after *Wessinger I* to salvage this theory. Losing in *Wessinger I* was not an extraordinary circumstance. *Cf.* ROA.4275-76 (claiming Wessinger "was 'amply justifie[d]'" to wait until *Wessinger I* rejected his *Martinez* argument to raise his current theory (citation omitted)); *In re Westcott*, 135 F.4th 243, 248 (5th Cir. 2025) ("Our precedents require a Rule 60(b)(6) movant to demonstrate how 'the initial judgment' was 'manifestly unjust.'" (citation omitted)). The Court should reverse the grant of his Rule 60(b)(6) motion.

## II. WESSINGER'S NEW EVIDENCE CANNOT FUNDAMENTALLY ALTER A CLAIM ADJUDICATED BY THE STATE COURTS TO EVADE AEDPA DEFERENCE.

Wessinger's ineffective assistance of counsel claim was adjudicated on the merits in State court. ROA.12781, 12817-32, 13801-02. The district court therefore should have applied AEDPA deference and limited its analysis to the State court record. It did not under the mistaken theory that evidence presented for the first time in this federal habeas proceeding "fundamentally altered" his claim. That was error, and the grant of habeas relief should be reversed because Wessinger cannot overcome AEDPA's relitigation bar. *See* Section V.A *infra*.

Wessinger's second amended postconviction petition asserted ineffective assistance of penalty-phase counsel based on a failure to adequately investigate and introduce mitigation evidence. *Wessinger I*, 864 F.3d at 390; *see* ROA.12781, 12817-32 (Wessinger's second amended postconviction petition). The State postconviction court adjudicated and denied that claim "on the merits." *Wessinger I*, 864 F.3d at 390; *see* ROA.13801-02 (denying all ineffective assistance claims on the merits); *State ex rel. Wessinger v. Cain*, 2003-3097 (La. 9/3/04), 882 So. 2d 605 (denying supervisory writ).

When a claim is adjudicated on the merits in State court, a federal court cannot "consider any evidence beyond the state court record" and can grant relief only if "the state court's decision 'was contrary to, or involved an unreasonable application of,' law clearly established by the Supreme Court" or "'was based on an unreasonable determination of the facts' in light of the state court record." *Nelson*, 72 F.4th at 656 (5th Cir. 2023) (quoting 28 U.S.C. § 2254(d)). These limits are essential to "AEDPA's goal of promoting comity, finality, and federalism by giving state courts the first opportunity to review [a] claim, and to correct any

36

constitutional violation in the first instance." *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011) (alteration in original) (citation omitted).

The district court originally concluded Wessinger's ineffective assistance claim was exhausted, adjudicated on the merits in State court, and therefore subject to deference under § 2254(d). ROA.2716-17. Even Wessinger himself recognized the State court had adjudicated the merits of this claim. ROA.2632-37. Applying AEDPA deference, the district court properly rejected Wessinger's claim. ROA.2726-29.

Then the Supreme Court decided *Martinez*, 566 U.S. 1, and Wessinger decided to change positions, assert his claim had not been raised before, and allege Gisleson was deficient in order to evade AEDPA's relitigation bar and the confines of the State court record. After once claiming his State petition was supported by "hundreds of pages of attached exhibits, including affidavits," demonstrating his "diligent efforts" to pursue the claim, ROA.2631-32, he diminished the relevant State court record to "eleven pages of generalities and two affidavits" and claimed Gisleson "completely failed to investigate, develop and present the mitigation available" to support the claim. ROA.2766-67. Wessinger argued evidence of abuse and neuropsychological testing gathered by

federal habeas counsel fundamentally altered his claim, making it procedurally defaulted unless he could show cause and prejudice. ROA.2768. The district court agreed Wessinger's new evidence meant the State court did not adjudicate Wessinger's claim, ROA.3237-3238, so it did not apply AEDPA deference or *Pinholster* in vacating Wessinger's death sentences, ROA.16623.

The Court should reverse this erroneous conclusion and apply § 2254(d)'s relitigation bar. Wessinger's additional mitigation evidence is not new; it is more of the same. *See Wessinger I*, 864 F.3d at 392 ("The second amended [State postconviction] petition also alleged, among other things, that: Wessinger had a history of head trauma and childhood seizures; he lost two children; he suffered psychologically when he lost three friends to murder as a teenager or young adult; and his sister had seizures and cerebral palsy.").

This Court has already rejected the idea that an ineffective claim rejected on the merits by State courts can be transformed into a new claim for federal habeas review by merely dusting up more mitigation evidence. In *Nelson*, this Court held that a habeas petitioner did not fundamentally alter his ineffective assistance of penalty-phase counsel

38

claim, raised in both State and federal proceedings, by adding a failure to investigate his mental health and to argue the acts of alleged accomplices reduced his culpability for the first time in his federal petition. *Id.* at 659. "[M]ore instances of trial counsel's alleged deficient performance at sentencing" do not "fundamentally alter the ineffective assistance claim adjudicated in the state court." *Id.* A petitioner "cannot aggregate alleged instances of ineffective assistance of counsel to satisfy the *Strickland* deficient performance and prejudice requirements and then disaggregate those theories to create new, unadjudicated claims and thereby circumvent § 2254(d)'s limitations." *Id.* at 659–60.

Even if Wessinger's allegations were substantially different, post-*Pinholster*, "new, material factual allegations" presented in federal court cannot fundamentally alter a related ineffective assistance of counsel claim adjudicated in State court. *Nelson*, 72 F.4th at 658–60; *see Pinholster*, 563 U.S. at 182, 186. To be sure, *Pinholster* left open the possibility that new evidence in rare circumstances could form the basis of a new claim itself, such as a new *Brady* claim that the prosecutor withheld newly discovered exculpatory evidence. *Pinholster*, 563 U.S. at

39

186 n.10. But this narrow exception (if it exists at all) is wholly inapplicable here. *Nelson*, 72 F.4th at 659–60.

Rather, a fundamental alteration occurs only when a change is so dramatic that the current claim was not "fairly presented" to the State court. *See id.* at 658 (citation omitted); *Anderson v. Johnson*, 338 F.3d 382, 386 (5th Cir. 2003). Fair presentment focuses on the legal arguments presented to the State court, not the facts before it. *See Bagwell v. Dretke*, 372 F.3d 748, 755 (5th Cir. 2004). When a petitioner's legal theory changes from State to federal court, it becomes a new claim. *Id.*

In contrast, a State court's adjudication of a claim "without the benefit of additional material evidence" or an evidentiary hearing has no bearing on whether it adjudicated the merits of the claim. *Sandoval Mendoza v. Lumpkin*, 81 F.4th 461, 472 (5th Cir. 2023). So a court's inquiry is not about which facts were before the State court, but rather about which claim the State court adjudicated. For this reason, new mitigation evidence, including evidence of a previously unknown mental illness, cannot fundamentally alter a failure-to-mitigate claim. *See Broadnax v. Lumpkin*, 987 F.3d 400, 408 & n.5 (5th Cir. 2021).

Here too, Wessinger's new evidence does not transform his adjudicated claim. There is no credible argument that Wessinger did not fairly present an ineffective assistance of penalty-phase counsel claim to the State court. ROA.12781, 12817-32; *Wessinger I*, 864 F.3d at 392 ("[I]t is clear that Gisleson raised Wessinger's claim …. The second amended petition, on which the state post-conviction court ultimately ruled on the merits, asserted Wessinger's claim for ineffective assistance of trial counsel at the penalty phase and made specific factual allegations, including that trial counsel did not obtain Wessinger's medical records.").

Among the many complaints about his counsel's mitigation strategy, Wessinger asserted trial counsel failed to collect medical records, to investigate whether Wessinger had head trauma or another neuropsychological condition, and to develop Wessinger's social history. ROA.12824-25. Wessinger's new evidence in federal court regarding neuropsychological conditions and alleged abuse does not fundamentally alter his claim that trial counsel should have found and presented such evidence. This evidence "at most, places [Wessinger's] claim 'in a stronger evidentiary position'" by showing what an investigation may have

41

uncovered, but "in no way does it 'fundamentally alter' the preexisting claim." *Broadnax*, 987 F.3d at 409.

Since this claim was adjudicated by the State court, under *Pinholster*, Wessinger had to overcome § 2254(d)'s relitigation bar based on the State court record. He cannot. *See* Section V.A *infra*; *see also* ROA.2726-29.

## III.   IF WESSINGER'S CLAIM WERE FUNDAMENTALLY ALTERED, IT WOULD BE TIME-BARRED.

Even if Wessinger's claim had been fundamentally altered from his State court claim, then it would have to be dismissed as time-barred under 28 U.S.C. § 2244(d)(1). Section 2244(d)(1) establishes a one-year statute of limitations for State prisoners to bring a habeas petition running, as relevant here, from the date a prisoner's judgment becomes final. Based on that date, the district court's grant of equitable tolling, and the statutory tolling for State postconviction proceedings, *see* 28 U.S.C. § 2244(d)(2), the statute of limitations expired on October 25, 2004. ROA.321, 324.

Wessinger's "fundamentally altered" claim first appeared in his amended habeas petition filed in November 2010. ROA.1464, 1695-767. Since the statute of limitations had run, any claim asserted in that

petition is time-barred unless it relates back to a claim in the original petition. *Mayle v. Felix*, 545 U.S. 644, 662–64 (2005); Fed. R. Civ. P. 15(c). To relate back, the claim must be "premised on the same or similar allegations as those in the original filing" and cannot "require factual support that 'differ[s] in both time and type' from that required by the timely claim." *Alaniz*, 5 F.4th at 636 (quoting *Felix*, 545 U.S. at 650). "New claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims[.]" *United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2009). Any claim "involv[ing] 'entirely distinct type[s] of attorney misfeasance'" cannot relate back. *Id.* (second alteration in original) (citation omitted). "[T]he critical element" in deciding whether a claim relates back is "whether the opposing party was put on notice of the new claim." *Johnson*, 126 F.4th at 1027 (citation omitted).

Wessinger could satisfy Rule 15(c), therefore, only if his amended habeas petition raised an ineffective assistance claim nearly identical to the one raised in his original habeas petition (which in turn was raised in his State postconviction petition). *Compare* ROA.12781, 12817-32 (State postconviction petition), *and* ROA.40, 79-88 (original habeas

43

petition), *with* ROA.1695-767 (amended habeas petition). But he vehemently argues the opposite: that the two claims are wildly different. As discussed in Section II *supra*, to escape AEDPA's relitigation bar and *Pinholster*, Wessinger argues that his current claim is so fundamentally altered from the one in his State postconviction petition (and so also his original habeas petition) that it was not fairly presented to the State court. *See Nelson*, 72 F.4th at 658–60; *Anderson*, 338 F.3d at 386–87. And there is the rub: To avoid the statute of limitations, his current claim must be nearly identical to one in his original habeas petition, but to avoid AEDPA's relitigation bar, he must argue that this claim never appeared in his original habeas petition (which mirrored his State postconviction petition). *Johnson*, 126 F.4th at 1027.

These are mutually exclusive positions: Wessinger's claim cannot be both fundamentally altered and fairly presented. *See Prible v. Lumpkin*, 43 F.4th 501, 515 n.4 (5th Cir. 2022) (noting a petitioner "cannot rely on relation-back doctrine below to overcome timeliness issues and now argue the claims are so factually distinguishable" (citing *Felix*, 545 U.S. at 657)). If the current claim is fundamentally altered, then the claim in the original petition did not present the substance of

the current claim. *See Bagwell*, 372 F.3d at 755. Without that substance, the State did not have a fair opportunity to realize Wessinger was bringing the current claim, *see id.*, and therefore did not have the required notice under Rule 15(c), *see Johnson*, 126 F.4th at 1027 & n.16.

In contrast, if his original habeas petition presented the substance of the current claim, then the State court adjudicated its substance because that habeas petition is materially identical to the second amended State postconviction petition. *See Anderson*, 338 F.3d at 386–87. Either both the State and its postconviction court had notice of the current claim (so the claim is timely-but-adjudicated) or neither had notice (so the claim is unadjudicated-but-untimely). Either way, Wessinger is not entitled to habeas relief.

### IV. DENYING FUNDING TO WESSINGER'S POSTCONVICTION COUNSEL IN ACCORDANCE WITH STATE LAW DOES NOT EXCUSE HIS PROCEDURAL DEFAULT.

The district court concluded that Wessinger could overcome the procedural default because denying funding to Gisleson rendered the State postconviction process ineffective to protect his rights. ROA.16613-21. In reaching this conclusion, the district court erred on multiple fronts.

45

*First*, the district court should have realized the contradiction between Wessinger's cause-and-prejudice theory and his underlying ineffective assistance claim: If trial counsel did not need resources to obtain this evidence, then postconviction counsel could have found it without resources, too.

*Second*, the district court refused to provide any deference to the State court's reasons for denying funding despite this Court's conclusion in *Wessinger I* that "the state post-conviction court's decisions to deny a hearing, discovery, and funds … are entitled to deference." 864 F.3d at 393.

*Third*, the district court relied almost entirely on another Louisiana prisoner's case rather than considering Wessinger's circumstances.

*Fourth*, a State has no obligation to provide postconviction funding to a prisoner, so the lack of funding cannot render the process ineffective to protect a petitioner's rights.

### A. Wessinger Cannot Blame a Lack of Resources for Gisleson's Failure to Obtain Evidence He Claims Was "Readily Available" to His Trial Counsel.

There is an obvious disconnect between Wessinger's cause-and-prejudice arguments and his arguments for his underlying constitutional

claim. For cause and prejudice, Wessinger asserts that, without funding, Gisleson could not have found any of the additional mitigation evidence. But Wessinger's trial counsel faced similar funding constraints and was also denied a mitigation expert (matters not at issue here). *E.g.*, ROA.1628 ("funds for an investigator were not granted" to his trial counsel); ROA.3850 (trial counsel affidavit stating he "lacked adequate time [and] funding" and "had no mitigation specialist"); ROA.4559-65 (trial counsel motion for funding); ROA.17121 (noting trial counsel "didn't have any money to work with").

As a result, Wessinger asserts, and the district court agreed, that his mitigation evidence could have easily been found had trial counsel talked to his brother. ROA.16633 ("The information about Wessinger's history of childhood seizures and violence [in] the Wessinger family was readily available to counsel through Troy Wessinger."). But if all it took was talking with Wessinger's brother (or Wessinger himself for that matter), then the State postconviction process cannot have barred him from bringing this claim. Gisleson did not need State funding to interview Wessinger's family.

47

Indeed, the district court recognized this when discussing trial counsel's performance: "Neither time nor inadequate resources would have prevented counsel from asking Troy Wessinger the necessary questions to elicit this critical mitigation evidence." ROA.16633. If lack of resources did not excuse *trial* counsel from finding this evidence, Wessinger cannot blame the State process for his *postconviction* counsel's failure to obtain it.

Consequently, Wessinger cannot prevail on both his cause-and-prejudice argument and his ineffective assistance claim. If his additional evidence "could not have been discovered earlier through due diligence" because of the State's denial of funding, "then the trial counsel would not have been ineffective." *In re Coleman*, 768 F.3d 367, 373 (5th Cir. 2014); *see Wessinger I*, 864 F.3d at 393. And if it could have been found by simply interviewing his family members, then Wessinger lacks cause to excuse his default and his failure to present this evidence to the State court. *See Shinn v. Ramirez*, 596 U.S. 366, 379–80, 382 (2022).

This Court should reject Wessinger's attempt to excuse his postconviction counsel for failing to obtain evidence that he claims was "readily available" to his trial counsel (who was also denied funding).

48

Based on Wessinger's own arguments, the State process did not impede his ability to find this mitigation evidence and present it to the State court. His claim is defaulted without excuse, and the judgment should be reversed.

## B. The State Court's Denial of Funding Is a Matter of State Law Entitled to Absolute Deference.

This Court could not have been clearer: "[T]he state post-conviction court's decisions to deny a hearing, discovery, and funds" are "entitled to deference." *Wessinger I*, 864 F.3d at 393. Inexplicably, the district court decided otherwise, concluding that the only State court decisions given deference in habeas proceedings are those pertaining to claims that can provide habeas relief. ROA.16620 & n.16. Even assuming the district court could ignore *Wessinger I*, its refusal to defer to the State court's decision was error.

Whether a State prisoner is entitled to funding in postconviction proceedings is a question of State law. A State has no federal obligation to provide postconviction counsel, let alone fund such counsel or postconviction experts. *E.g.*, *Stevens v. Epps*, 618 F.3d 489, 502–04 (5th Cir. 2010) (rejecting a defendant's challenge based on a "complete breakdown in the state [postconviction] process"); *Kemp v. Dretke*, 86 F.

49

App'x 680, 682 (5th Cir. 2004) (per curiam) (noting there is "no right to funding to ensure that [postconviction] counsel is effective"). Without a federal right, Wessinger's entitlement to postconviction funding depends on State law, which is how the State postconviction court analyzed his funding request. *See* ROA.7055, 7062-63 (denying funding request for failing to comply with the standard set forth in *Touchet*, 642 So. 2d 1213). Gisleson's unsuccessful writ application to the Louisiana Supreme Court, which challenged the denial of funding, recognized that the State postconviction court denied the funding motion because he "failed to make the requisite showing under *Touchet*." ROA.14598.

In habeas proceedings, federal courts "defer to [the State court's] determination of state law." *Schaetzle v. Cockrell*, 343 F.3d 440, 449 (5th Cir. 2003). When a State court resolves an issue under State law, "a federal habeas court may not conclude otherwise." *Charles*, 629 F.3d at 500. Habeas allows review of "state court misapplications of *federal* law"; it provides no "authority to rule that a state court incorrectly interpreted its own law." *Id.* at 500–01. As a result, the State court's denial of funding to Wessinger under State law conclusively resolved his entitlement to funding. *Id.*

50

The district court's statement that the denial of funding here was "unlawful" is, in essence, an attempt to reverse the State court's interpretation of State law. *See* ROA.16621. It had no authority to do so. *Charles*, 629 F.3d at 500–01. The district court's erroneous view that Louisiana law required funding experts for Wessinger—contrary to a Louisiana court's own conclusion—led it to excuse Wessinger's default. ROA.16621 ("The Court's holding in this matter is limited to … the unlawful nature in which Wessinger was denied resources[.]"). The district court thus realized Wessinger could not show cause and prejudice if the funding was lawfully withheld. *Id.* Because Wessinger was not entitled to funding under Louisiana law, ROA.7055, 7062-63, federal courts have no power to conclude otherwise. His cause-and-prejudice argument necessarily fails, and the judgment should be reversed.

## C. A Different Louisiana Prisoner's Funding Litigation Has No Bearing Here.

In concluding that the denial of funding was "unlawful," the district court relied on the case of a different Louisiana postconviction petitioner, Jimmy Ray Williams, who sought funding from a State court, obtained an order directing LIDAB to provide funding, only for LIDAB to refuse to provide the funds due to its policy restricting funds from defendants

51

represented by pro bono counsel. ROA.16616-19. Williams's State postconviction court concluded that LIDAB's policy violated State law, LIDAB amended its policies, and Williams ultimately obtained postconviction funding. ROA.16618-19. Based on these events, the district court believed that Wessinger, too, should have qualified for funding but for LIDAB's "unlawful" policies. ROA.11618-20.

Whatever funding problems Williams faced, they have no bearing here because Wessinger's counsel's lack of funding was due to Wessinger's failure to satisfy the State-law standard to qualify for funding in the first place, not LIDAB's policies. *See* ROA.7055, 7062-63.

To be sure, LIDAB told Gisleson that all of its funding was allocated to CPCPL, and CPCPL told Gisleson it would not fund experts or contract investigators. ROA.3976, 12524, 12526. But the State process did not respond to these circumstances by decreeing Wessinger simply out of luck. Instead, the postconviction court held a hearing to consider whether Wessinger satisfied State-law standards for court-ordered funding. ROA.7051, 7055, 7062-63. The postconviction court then concluded that he did not meet the standard and denied funding. ROA.7055, 7062-63.

The State postconviction court's denial of funding to Wessinger makes his case markedly different from Williams's. There, the Louisiana Supreme Court remanded "to the district court for [an] evidentiary hearing on the funding question and specific ruling on the [State] statutory issues" and "then [to] consider the constitutional issue presented, in light of the statutory funding issue." *State ex rel. Williams v. State*, 2004-0575 (La. 12/1/04), 888 So. 2d 792, 797. On remand, LIDAB "adopted new rules," and Williams "received the requested funding from the LIDAB," so there was "no longer a justiciable case or controversy." *State ex rel. Williams v. State*, 2004-0575 (La. 1/12/07), 946 So. 2d 172, 172.

Here, Wessinger (unlike Williams) did not challenge LIDAB's policy in State court; rather, he contested only the State court's denial of funding. *See* ROA.7019-63 (funding hearings); ROA.14593-619 (writ application). And on that issue, the State court held that Wessinger failed to make the required showing under State law that he was entitled to court-ordered funding. ROA.16619. As a result, Wessinger, unlike Williams, never gave the State court a chance to correct the supposedly unfair LIDAB process. He cannot complain about it now in federal court.

53

Also, the *Williams* litigation did not, as the district court believed, establish that "the process afforded to *Wessinger* was fundamentally unfair." ROA.16621 (emphasis added). *Williams* says nothing about the fundamental fairness of denying funding to a petitioner like Wessinger who fails to qualify for court-ordered funding under State law. In fact, the *Williams* litigation was ongoing when Wessinger sought postconviction funding. Gisleson's writ application to the Louisiana Supreme Court noted the court-ordered funding in *Williams*, but argued only that Wessinger's funding request should have been addressed *ex parte*. ROA.14617. That Wessinger's writ application failed to challenge the *denial* of funding under *Williams* bars him from now raising that issue in federal court.

The district court here also failed to consider whether Wessinger would have received funding but for LIDAB's policy. Since the State court concluded that Wessinger failed to demonstrate that "funding for experts would be necessary" to support his claims, ROA.7055, 7062-63, it is rank speculation that cash-strapped LIDAB would have provided unnecessary funding, *see* ROA.12489 (noting a lack of "sufficient funds[] to pay for experts' fees or investigative costs"). In sum, the circumstances in

54

*Williams* do not change the fact that Wessinger was properly denied funding under State law and that the federal courts have no business second-guessing that application of State law. Reversal is in order.

## D. Denying Funding Did Not Make the State Process Ineffective to Protect Wessinger's Rights.

Beyond the problems outlined above, Wessinger's cause-and-prejudice claim is legally meritless. Postconviction funding is not constitutionally mandated, so the denial of funding cannot excuse Wessinger's failure to present his claim to the State court (even assuming it is fundamentally altered).

Wessinger bases his theory in 28 U.S.C. § 2254(b)(1)(B)(ii)'s exception to exhaustion if "circumstances exist that render [the State corrective] process ineffective to protect the rights of the applicant." Thus, Wessinger must show the denial of funds left his rights ineffectively protected. The problem is that Wessinger had no right to postconviction funding, *Kemp*, 86 F. App'x at 682, and even denial of mitigation funding *at trial* does not deny due process to a capital defendant, *Moore*, 225 F.3d at 502–03 (rejecting a "claim of entitlement to a mitigation expert"). This dooms Wessinger's State-process claim. Without a constitutional obligation for the State to provide such funding,

its postconviction process is effective even if it denies financial assistance. *See Coleman v. Thompson*, 501 U.S. 722, 754 (1991) (noting when "the State has no responsibility" to assist a petitioner, "it is the petitioner who must bear the burden of a failure to follow state procedural rules"); *Stevens*, 618 F.3d at 502–05 (rejecting challenge based on a "complete breakdown" in the protection of State procedural rights that were not constitutionally required).

A State's process is "fundamental[ly] fair[]" if it gives an indigent defendant "the 'basic tools of an adequate defense or appeal.'" *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985) (citation omitted). At trial, the State satisfies the vast majority of that obligation by providing court-appointed counsel, knowledgeable in what evidence to gather and present to provide an adequate defense, including mitigation. *Moore*, 225 F.3d at 503. In rare cases, like a defendant whose sanity is a "significant factor" in the case, the basic tools require "access to a competent psychiatrist" to examine him. *Ake*, 470 U.S. at 83. This is because counsel is not expected to raise such arguments about the "mysterious process" of the mind without "the assistance of outside professionals." *Moore*, 225 F.3d at 503.

56

Even then, the State need not provide the defendant "funds to hire his own" psychiatrist so long as one is available. *Ake*, 470 U.S. at 83.

Mitigation experts or other experts aimed at discovering the ineffectiveness of trial counsel do not fall within the basic tools that a State must fund if counsel is provided. *See Moore*, 225 F.3d at 503. Attorneys are "cognizant of the role of mitigating evidence in staving off the death penalty" and should know what arguments may be fruitful and the best sources of such evidence. *Id.* Counsel can investigate, talk to witnesses, and obtain relevant records as part of his responsibilities. Attorneys also know what constitutes inadequate assistance and can investigate such claims themselves. While experts may be helpful, "indigent defendants are not privileged to force the state to expend its funds on this exercise in bolstering an attorney's fundamental skills." *Id.*

As a result, the only tool arguably necessary for Wessinger to bring his claims for State postconviction relief was an attorney, which the State process was not constitutionally obligated to provide and yet did. *See Shinn*, 596 U.S. at 386 ("[T]here is no constitutional right to counsel in state postconviction proceedings."). Gisleson had years to prepare Wessinger's postconviction petition and find mitigating evidence: He was

57

appointed to represent Wessinger in January 2001, ROA.14382, and filed the second amended petition in August 2003, ROA.12880. As the district court recognized, the evidence at issue could have been found regardless of "time" or "inadequate resources" by asking Wessinger's own brother (not to mention Wessinger himself), ROA.16633, which Gisleson was fully equipped to do—no court-ordered funding needed.

Wessinger therefore has no excuse for failing to present his claim in State proceedings (assuming the claim is fundamentally altered). The proper way to challenge any deficiencies in the claims presented to the State court was to argue Gisleson was deficient by not using his time and funds to pursue such claims. *E.g.*, *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993) (addressing "whether [defendant's] counsel erroneously failed to use his own money to aid in funding [the] defense"); *Wogenstahl v. Mitchell*, 668 F.3d 307, 340 (6th Cir. 2012) (noting a challenge to denied mitigation funding "is more aptly viewed as a claim for deficient performance of counsel" because attorneys bear "the burden of the mitigation investigation"). But Wessinger had effective postconviction counsel who knew which issues to investigate and could have done so. *Wessinger I*, 864 F.3d at 393.

58

The State process provided Wessinger with effective counsel. He cannot claim the process was ineffective to protect his rights by not giving him more tools that the Constitution does not require. The district court erred by excusing Wessinger's procedural default, and the judgment should be reversed.

## V. IN ALL EVENTS, WESSINGER'S TRIAL COUNSEL PROVIDED EFFECTIVE MITIGATION ASSISTANCE.

The district court concluded Wessinger's trial counsel provided ineffective assistance at the penalty phase by failing to investigate and offer evidence about Wessinger's allegedly abusive childhood and brain damage. ROA.16633-37. This was erroneous on multiple grounds, and this Court thus should reverse, reinstate Wessinger's sentences, and render judgment for the State.

*First*, as explained in Section II *supra*, this claim was adjudicated in State court and therefore is subject to § 2254(d) and *Pinholster*, neither of which the district court applied here. Applying those restrictions, Wessinger fails to show the State court's decision was unreasonable. His attorney had no obligation to undertake seemingly frivolous investigations, and he reasonably sought to win credibility with the jury and present Wessinger as non-violent.

59

*Second*, even if this Court treats the claim as unadjudicated and excused from default, Wessinger cannot prevail. The district court's conclusion that trial counsel could have uncovered this evidence with a proper investigation is incompatible with the claim that postconviction counsel could not have found this same evidence. *See* Section IV.A *supra.* Moreover, strategic decisions informed the scope of the investigation and the evidence presented during the penalty phase, and even if counsel's performance was deficient, there is no reasonable probability that a jury "would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Pinholster*, 563 U.S. at 198 (quoting *Strickland*, 466 U.S. at 695).

## A. The State Court's Adjudication of the Claim Was Not Unreasonable.

As explained in Section II *supra*, this Court should conclude that Wessinger's current claim was adjudicated on the merits in State court. Wessinger therefore can obtain relief only by showing the State court's rejection of his claim "'was contrary to, or an involved an unreasonable application of,' law clearly established by the Supreme Court, or that the decision 'was based on an unreasonable determination of the facts' in light of the state court record." *Nelson*, 72 F.4th at 656 (internal citation

omitted) (quoting 28 U.S.C. § 2254(d)). In conducting this analysis, the Court is limited to the State court record. *Id.* No State court provided specific reasons for rejecting Wessinger's arguments about failing to investigate or present mitigation evidence,[5] so this Court "must determine what arguments or theories … could have supported[] the state court's decision" and whether "fairminded jurists could disagree that those argument or theories are inconsistent" with prior Supreme Court precedent. *Harrington v. Richter*, 562 U.S. 86, 100, 102 (2011).

To show ineffective assistance of counsel, Wessinger must prove his counsel's performance was so deficient that he "was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. For deficient performance, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Regarding investigations, "[a]n attorney need not pursue an

---

[5] The Louisiana Supreme Court denied Wessinger's writ without explanation, *State ex rel. Wessinger*, 882 So. 2d 605, and the postconviction court concluded counsel did not deficiently prepare his expert witnesses while denying the remainder of the claim without explanation, *see* ROA.13783-86, 13801-02.

investigation that would be fruitless, much less one that might be harmful to the defense." *Harrington*, 562 U.S. at 108. Defense counsel was "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategy." *Id.* at 107.

Wessinger cannot overcome AEDPA's relitigation bar because he relies almost entirely on evidence beyond the State court record. *See* ROA.1695-765. He points to evidence of his family's history, his allegedly abusive childhood, neurological conditions and seizures, and deaths of friends as matters his counsel should have investigated and presented, *id.*, but nothing in the State court record supports his allegations. At most, the State court record contains a few affidavits from persons claiming counsel failed to contact them, but they do not explain what they would have offered in mitigation if called. ROA.12012-13, 12305-11.

In contrast to Wessinger's unsupported assertions, the State court record reflects counsel's preparation for the penalty phase. He presented seventeen mitigation witnesses ranging from "former employers, the mothers of [Wessinger's] children, his brother, a preacher, his sister, his aunt, a cousin, a psychologist, a psychiatrist, a commutation expert, and

a friend." ROA.2726; *see* ROA.6615-730 (Penalty Phase Tr.). These witnesses testified Wessinger was a hardworking family man with a drinking problem. ROA.2726-27, 6615-730. Witnesses described Wessinger's close relationship with his children, ROA.6622-24, 6634-35, and how he "is a totally different person when he is drinking," ROA.6636; *see* ROA.6625, 6628, 6651, 6654, 6656-58. Defense experts included a psychologist, Dr. Rostow, and a psychiatrist, Dr. Cenac, who discussed Wessinger's alcoholism, how he was under the influence when he committed the murders, and how "[h]e would be a model prisoner" rather than a violent inmate while serving a life-without-parole sentence. ROA.6648, 6651-53, 6658 (Rostow Testimony); ROA.6676, 6682-84 (Cenac Testimony).

This evidence all supported counsel's strategic mitigation argument: Wessinger was a "devoted father," a hard worker, and loved by his family and others, yet committed a horrific crime while excessively drunk. ROA.6750-52, 6754. Counsel argued the jury should spare his life because he would not be violent in the structured prison environment away from alcohol where Wessinger would spend the rest of his life if the jury declined to impose a death sentence. ROA.14234-36. He implored the

63

jury that alcohol "explain[ed] what happened to an otherwise good father and hard worker" who "has not been in trouble." ROA.14234. Counsel believed it imperative to win the jury's trust to avoid capital punishment. *See* ROA.6750, 6753. Thus to build credibility, counsel emphasized that he did not coach the experts, had not discussed what exactly they would testify about, and pointed out that Dr. Cenac testified for the State in other cases. ROA.6651, 6677-78.

Counsel recognized that "some people might fault [him] for" his decisions by choosing to present this argument rather than trying to garner sympathy by talking about problems in Wessinger's past, thereby acknowledging he knew of other strategies but chose this one. ROA.6753. Counsel explained that he wanted to avoid any perception by the jury that he was "play[ing] games" with them. *Id.*

As for claims of abuse, childhood seizures, or brain injury, all the State court record shows is Dr. Rostow's testimony that Wessinger denied he was abused, "described his early life as healthy and happy," with "an orthopedic problem corrected with special shoes" as "his only medical complaint." ROA.6650. Dr. Rostow further testified that Wessinger "denied a history of mental illness" or "serious seizures," though "[h]e did

64

have some minor head trauma, but they were not of any great consequence." ROA.6651. Wessinger's counsel thus cannot be ineffective for failing to investigate abuse or brain damage that his own client denied or failed to disclose. *Johnson v. Cockrell*, 306 F.3d 249, 252–53 (5th Cir. 2002) ("This Court has consistently refused to hold attorneys responsible for introducing mitigation evidence that their client and other witnesses fail to disclose.").

Based on this record, Wessinger has not shown that the State court's rejection of his claim was unreasonable. Counsel's strategy, while ultimately unsuccessful, "falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Wessinger's attorney reasonably decided when faced with horrific murders "that the best chance to save [Wessinger's] life was to try to persuade the jury that [he] would not be dangerous in the future if he were imprisoned for life." *Brown v. Thaler*, 684 F.3d 482, 499 (5th Cir. 2012). He was not ineffective by focusing his argument on matters that would "maintain credibility with the jury." *Id.* at 497. Moreover, the State court record is devoid of any non-speculative claims as to what additional investigation would have demonstrated, so the State court also could have reasonably

65

concluded Wessinger failed to prove prejudice. *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).

### B. Wessinger's Claim Fails under De Novo Review with New Evidence.

Treating Wessinger's claim under a de novo standard with his new evidence changes little of the analysis discussed in the prior section. "Even under *de novo* review, the standard for judging counsel's representation is a most deferential one." *Harrington*, 562 U.S. at 105. A court must ask whether counsel was "incompeten[t] under 'prevailing professional norms,' not whether [he] deviated from best practices or most common custom." *Id.* (citation omitted).

Wessinger's new evidence purports to show what an investigation in his abusive childhood or neuropsychiatric conditions could have uncovered. As explained above, this is a doubtful proposition because Wessinger denied abuse or any severe head trauma when talking to his own defense expert. ROA.6650-51. Assuming counsel failed to investigate, any investigation into Wessinger's personal history would have started with Wessinger himself, and there is no basis to believe Wessinger would have told his attorney something different. As counsel explained, the image of "Wessinger as a good person who suffered from

66

alcoholism and was not acting like himself at the time of the crime" was "the only theory [he] had based on the people [he] talked to." ROA.3850. The people counsel consulted included Wessinger and his family. ROA.17117. It was wholly reasonable for trial counsel to not waste time seeking mitigation evidence of abuse and brain trauma from his client's family that his client denied. *See Harrington*, 562 U.S. at 107; *Johnson*, 306 F.3d at 252–53.

But even accepting the speculative claim this evidence would have been uncovered, Wessinger cannot show prejudice. Evidence about brain injuries and an abusive childhood are "double edged" because "it could all be read by the jury to support, rather than detract, from his future dangerousness." *E.g.*, *Johnson*, 306 F.3d at 253; *Brown*, 684 F.3d at 499. This is particularly true here. Wessinger's new evidence about his violent family background and brain damage permanently impairing his ability to make good decisions would have easily convinced a jury that he was permanently dangerous—the exact opposite of the "hardworking family man" perception trial counsel was attempting to develop in front of the jury. ROA.16636.

67

The district court rejected this argument below because the cited cases above come from Texas, which directs the jury to consider future dangerousness in imposing the death penalty, rather than Louisiana. *See* ROA.16637; Tex. Crim. Pro. Art. 37.071(b)(1). This misses the point. The new evidence does Wessinger little good unless the jury viewed it as mitigating, and Louisiana juries would not find evidence that Wessinger is a permanent danger to be mitigating. This, of course, is why Wessinger's counsel tried to convince the jury that Wessinger would not be a future danger as part of his mitigation argument. *See* Section V.A *supra.*

Beyond the danger inherent in this evidence, none of it would have persuaded a jury to spare his life. Wessinger callously murdered two people for $7,000. The murders were "gut-wrenching," and the evidence was "shock[ing]" and "horrible." ROA.6594. Wessinger went to the restaurant to rob it and murder anyone who saw him: "[H]e planned to leave no witnesses." *Wessinger*, 736 So. 2d at 169. Wessinger arrived and was greeted by Armentor, who Wessinger then shot twice in the back. *Id.*; ROA.6367-68 (Armentor Testimony). Next, Wessinger put a gun to Ricks's head and pulled the trigger, but the gun thankfully did not fire.

68

*Wessinger*, 736 So. 2d at 169; ROA.6375-77 (Ricks Testimony). Wessinger murdered both Guzzardo and Breakwell as they begged for their lives. *Wessinger*, 736 So. 2d at 169. The jury heard Guzzardo's 911 call that recorded her confrontation with Wessinger, her pleas that he spare her life, the shot, and her agony as her life drained away. *E.g.*, ROA.6386, 6515-16, 6735-36. Then he rode off on his bicycle. *Wessinger*, 736 So. 2d at 169.

Unsurprisingly, the jury concluded the murders were "especially heinous, atrocious, or cruel," among other aggravating circumstances. *Wessinger*, 736 So. 2d at 170. Louisiana juries routinely imposed the death penalty in similar cases, and many of those involved only one victim. *Id.* at 197 (collecting cases); *see Wong v. Belmontes*, 558 U.S. 15, 28 (2009) (noting evidence of multiple murders is "the most powerful imaginable aggravating evidence" (citation omitted)). There is no reasonable probability the jury would have been swayed by Wessinger's new claims of abuse and brain damage. He therefore fails to show any prejudice. *See Wong*, 558 U.S. at 27–28.

69

## CONCLUSION

For these reasons, the Court should reverse the district court's grant of habeas relief, vacatur of Wessinger's sentences, and remand to State court for resentencing, and render judgment for the State.

Respectfully submitted,

ELIZABETH B. MURRILL
Attorney General of Louisiana

J. BENJAMIN AGUIÑAGA
Solicitor General

*/s/ Morgan Brungard*
MORGAN BRUNGARD
Deputy Solicitor General

ELIZABETH L. BROWN
Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 999-1864
BrungardM@ag.louisiana.gov

*Counsel for Respondent-Appellant*

## CERTIFICATE OF SERVICE

I certify that on October 23, 2025, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ Morgan Brungard*
MORGAN BRUNGARD

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this brief complies with:

(1) the type-volume limitations of <u>Federal Rule of Appellate Procedure 32(a)(7)</u> because it contains 12,966 words; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ Morgan Brungard*
MORGAN BRUNGARD

Dated:    October 20, 2025